UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **STEVEN-REYNOLDS** | **CASE NO. 2:22-CV-01238** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **WILSHIRE INSURANCE CO ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## TRIAL OPINION

The Court held a one-day bench trial on September 16, 2024.

## PARTIES

Plaintiff in this matter is Diana Steven-Reynolds and Defendant, Wilshire Insurance Company ("Wilshire") is the insurer of Reynolds' four rental properties located in Lake Charles, Louisiana and a motel building. IAT Insurance Group ("IAT") is a holding company and did not issue the policy of insurance. At the trial, the Court dismissed IAT on motion of defense counsel.

## THE INCIDENT

On August 27, 2020, Hurricane Laura made landfall near Lake Charles, Louisiana, and on October 9, 2020, Hurricane Delta made landfall near Lake Charles, Louisiana. Plaintiff alleges that these two Hurricanes damaged her rental properties. During the relevant time period Wilshire insured the properties.

## CLAIMS

Plaintiff filed this lawsuit alleging claims for breach of contract, and bad faith penalties and attorney fees pursuant to Louisiana Revised Article 22:1892 and 22:1973.

All claims for damages to the motel were previously dismissed pursuant to a motion for summary judgment, as well as loss of business income and negligent infliction of emotional distress.[1]

The Court discussed Plaintiff's Delta claim and noted that there was a second inspection of the properties after Hurricane Delta. Because Plaintiff could not differentiate between the Delta and Laura claims, there could not be any breach of contract claim as to Plaintiff's Delta claims, as well as any statutory penalties. As such, any separate claims concerning Delta were dismissed. The Court explained to Plaintiff's counsel that these claims were dismissed because he had no expert to provide a report or testify as to any separate damages from Delta.

The remaining claim that exists after all motions were decided by the Court is whether the second payment to Plaintiff was untimely, and if so, was Wilshire arbitrary, capricious, and without probable cause for the alleged untimely payment.

## TRIAL TESTIMONY

*David Ray Smeltz*

Plaintiff called Mr. Smeltz in cross as Defendant's corporate representative. Smeltz has been employed by IAT since 2017 and has worked in the insurance industry for over 30 years. Smeltz testified that he is the major case unit director for commercial property. He is licensed as an Associates in Claims for claims adjustments with multiple licenses.

---

[1] Docs. 48 and 49.

Smeltz was assigned this claim after the instant lawsuit was filed in April 2022. Smeltz testified that the notice of loss was 8/31/2020. Smeltz testified that IAT uses Transcynd, an independent adjuster, to adjust the instant claims. Transcynd received notice of Plaintiff's Hurricane Laura claim on September 3, 2020, and inspected the four rental properties on 9/13/2020. The estimate was completed on 9/16/2020, and a final report was issued to Wilshire by Transcynd on 9/21/2020.[2]

The Transcynd report, which used Xactimate to adjust the loss, indicated a loss of $62,841.21. A payment was made to Plaintiff by the insurer in the amount $33,380.45 on September 22, 2020, based on the initial inspection and the final inspection. On or about September 25, 2020, Plaintiff disputed the loss based on a public adjuster's estimate,[3] of the Stephens Engineering Consultant ("PA") report by Frontline. The Court notes that this report has been excluded by the Court in a previous Memorandum Order.[4]

Smeltz testified that the inspection Wilshire conducted after Hurricane Delta included all damages from both Hurricane Laura and Hurricane Delta. Based on the reinspection after Hurricane Delta, Transcynd issued Plaintiff another payment of $118,910.25 on April 8, 2021.[5] The day of the check presented by Plaintiff is May 3, 2021. Smeltz explained that the initial check was made April 8, 2021, but the original adjuster called Transcynd and advised that it had not received the check, so Wilshire reissued a

---

[2] Defendant's exhibit 4.
[3] Plaintiff's exhibit 6, Doc. 160-10.
[4] Doc. 80.
[5] Plaintiff's exhibit 10.

second check on May 3, 2021. Smeltz testified that the check was for both Hurricane claims, despite a memo that identified the insurance proceeds as Hurricane Laura.[6]

After Plaintiff, through counsel sent a "Final Demand Before Suit,"[7] Plaintiff filed a Hurricane Delta claim on April 20, 2021.[8] Wilshire made no further payments to Plaintiff after the May 3, 2021/April 8, 2021, check was issued.

The original Plaintiff's attorney, Mr. Harry Cantrell, agreed with Wilshire that the check would cover damages for both Hurricane Laura and Delta, and if that payment was not enough funds, Plaintiff could make an additional claim on Hurricane Delta.

Smeltz testified as to a February 2, 2022, letter authored by Bruce Copeland, of the Harry Cantrell law firm,[9] which requested Hurricane Laura damages of $518,123.21, with removal of decking and reroofing for Hurricane Delta totaling $374,034.09. These damages also included certain damages for the motel, which the Court has dismissed due to a roof exclusion in the policy. After receiving the letter, Mr. Cantrell and Plaintiff's adjuster agreed that the claims would be combined, so the check issue in April/May included both claims—Hurricanes Laura and Delta.

Smeltz testified about a letter dated January 19, 2021, which indicates that Wilshire acknowledged it made a payment to Plaintiff on September 22, 2020. Smeltz testified that the policy had a deductible of 5% or a minimum of $2,500 per building.[10] The RCV was determined to be $13,918.76, deducting $1,391.36 for depreciation for a total of $12,527.40

---

[6] *Id.*
[7] Defendant's exhibit 2.
[8] Plaintiff's exhibit 7, Doc. 160-7.
[9] Plaintiff's exhibit 8, Doc. 160-8.
[10] Plaintiff's exhibit 1.

and also deducting the wind and hail deductible of $10,500.00 based on the insured value of the property per building. After depreciation and the wind deduction, Plaintiff's damages totaled $2,270.40, the amount paid by Wilshire pursuant to the policy.

Wilshire relied on Transcynd's adjustment of the claim to make its payments. Smeltz testified as to the Transcynd report[11] dated September 21, 2020, to which a check was issued for payment on September 22, 2020. These payments were made after deducting the deductible and depreciation. Plaintiff made claims for tarping on October 5, 2020, and Wilshire made payments on October 6, 2020. Wilshire made the tarping payments directly to PanHandle Preference LLC who tarped the roofs. The Court finds that all of these payments were timely.

On October 26, 2020, Wilshire was notified that Plaintiff had obtained an independent public adjuster ("PA") who made an estimate. Wilshire instructed their independent adjuster to investigate Plaintiff's claims and reinspect the properties. On November 14, 2020, Transcynd and Plaintiff's PA conducted a re-inspection. On November 30, 2020, Transcynd provided Wilshire with a report.[12] Transcynd recommended that because an agreed scope could not be reached, additional experts would be needed. Smeltz testified that Plaintiff was seeking the policy limits as to each of the four rental properties as well as additional damages not covered under the policy. The policy limits are as follows:

| Building 1 | See Street | $210,000.00 |

---

[11] Defendant's exhibit 4.
[12] Defendant's exhibit 5.

| | | |
|---|---|---|
| Building 2 | Mary Street | $85,000.00 |
| Building 3 | Woodring Street | $85,000.00 |
| Building 4 | Decker Street | $85,000.00[13] |

Because Wilshire did not have sufficient information to pay the claim, it contacted and engaged an engineer as to the dispute concerning the scope of damages.

Smeltz explained that it needed the additional inspections and opinions/reports from an engineer because Wilshire believed that Plaintiff was attempting to get damages to the buildings that were not covered by the policy. A re-inspection by Stephens Engineering occurred on January 29, 2021, and the report (the "Stephen's Report") was completed February 11, 2021.[14] At that time, the report needed to be sent to Plaintiff's PA, for review and to determine and/or differentiate between Hurricane Laura and Hurricane Delta. Smeltz explained that the Stephen's Report dated January 29, 2021, which covered all four properties, covered the wind damage for both Hurricane Laura and Delta. At the time of the January 29, 2021, Stephen's Report, Plaintiff had not filed or made a specific Hurricane Delta claim.

The Stephen's Report, which include all wind damage to the four properties, was sent to Transcynd on February 11, 2021. On February 26, 2021, the Stephen's Report was sent to Plaintiff's counsel. Wilshire's February 5, 2021, letter requested that Plaintiff provide any additional information she might have for her damage claims. Plaintiff provided no additional information. Wilshire received Transcynd's updated report on

---

[13] Defendant's exhibit 6, Doc. 161-5.
[14] Defendant's exhibit 8.

March 29, 2021, and determined that it had sufficient information to make additional payments.[15] On March 31, 2021, Wilshire advised Plaintiff that it had received the updated report and requested a response as to who and how to make additional payments. Wilshire made additional payments on April 8, 2021, (reissued May 3, 2021) of $28,689.43, $14,868.55, $26,933.77, and $48,419.05 for a total of $118,910.45, based on the updated report.[16]

Smeltz explained that the original checks were issued April 8, 2021, but were mailed to the law firm's address in New Orleans as stated on the law firm's W-9 form. Because Copeland emailed and advised Wilshire to mail the checks to a different address, the checks were reissued and mailed on the same day that Wilshire received Copeland's request.

When these April 9, 2021 (May 3, 2021), checks were issued, Plaintiff had not made a Hurricane Delta claim. Smelts explained that Plaintiff made a Hurricane Delta claim on April 20, 2021.[17] The claim note of May 4, 2021, indicates that Plaintiff's representative, Bruce Copeland, had emailed Wilshire and stated that he could not separate the damages from the two storms, and if the total damages viewed at the time of the inspection with the engineer are covered, then the new claim (Delta) will be moot. Thus, it appears to the Court that Plaintiff's representative (Copeland) agreed to combining the claims. Smeltz confirmed that Wilshire had acknowledged notice of the claim and advised that a reinspection had been made of the property after Hurricane Delta, and that Wilshire had

---

[15] Defendant's exhibit 6.
[16] Defendant's exhibit 10. Doc. 160-10.
[17] Defendant's exhibit 2.

made all payments as to both claims. Smeltz testified that he considered this to be a response to Plaintiff's Hurricane Delta claim.

Smeltz testified as to a February 2, 2022, demand letter it received from Copeland on behalf of Plaintiff's law firm. By this time, Plaintiff was represented by an attorney, as was Wilshire. On February 15, 2022, Defense attorney responded to the demand.[18] This letter indicates that Wilshire was represented by counsel[19] and they had received the demand letter dated February 2, 2022, and also informed counsel for Plaintiff that Wilshire had issued payment for covered ACV damages that occurred as a result of both Hurricanes Laura and Delta.

Smeltz testified that Wilshire made all payments timely under the policy, and all payments were made without any intent to harm.

*Bruce Copeland*

Copeland has a construction license from the State of Texas and a registered business. He is employed as an expert witness for attorneys concerning disasters on behalf of policyholders against insurance carriers. Copeland was hired by the Cantrell law firm, as a paralegal/expert and he managed that law firm's claims.

Copeland testified that he got involved in Reynold's claims after estimates were prepared and reflected a vast difference in damages as to scope. Copeland requested information from John Wertis that was used to support the $33,000 payment made by

---

[18] Defendant's exhibit 16.
[19] Gieger, Laborde & Laperouse, L.L.C.

Wilshire; his intent was to determine why there was a vast difference in the scope of damages. Copeland testified that he was unable to get a response from Wilshire.

Copeland testified that on January 14, 2021, he sent a letter[20] to John Wertis advising that he was involved with the claim. As of that date, Copeland had reviewed the estimates that Wilshire used for its adjustment of the claim, but he was seeking other documents to support that estimate, specifically photos.

Copeland's testimony was not consistent with the letters he authored. In the January 14, 2021, letter, Copeland had received the Transcynd report, he had spoken with the PA and had been informed that an engineer was being engaged to investigate claims by Plaintiff's PA that the properties had shifted. By January 19, 2021, he was provided additional information as to the payments and by January 29, 2021, Copeland had received all the information he had requested, other than the photos, and he had attended a reinspection with the engineer, the independent adjuster, and the PA. Copeland testified that he requested this information for six months and did not receive a response.

Defense counsel presented an email chain letter dated January 19, 2021, sent by Defendants to the Cantrell law group and Copeland. The January 19, 2021, letter was in response to Plaintiff's January 14, 2021. Counsel for Defendant pointed out that the email was received by the recipient. Copeland responded on February 5, 2021, acknowledging that he had attended a reinspection. Copeland acknowledged that a February 26, 2021, letter from Wertis was emailed to his email address, with attached documents/photos.

---

[20] Defendant's exhibit 2.

Copeland responded to Wertis's email informing of Louisiana law and attorney-client communications, but he does not recall receiving Wertis's email with the attachment. A subsequent letter dated March 31, 2021, was sent to Copeland from Wilshire inquiring as to how Wilshire was to issue the additional payments. Copeland responded to that letter on April 7, 2021.

Copeland testified that he had not received photos to support Wilshire's claim. However, the evidence submitted proves that the email was sent and confirmed as being received by the recipient at the Cantrell law firm of which Copeland was employed. The Court finds that Copeland's testimony is inconsistent with the evidence submitted at trial.

Regarding the Delta claim, Wilshire/IAT sent a letter to Copeland acknowledging Plaintiff's later filed Delta claim. This letter noted that IAT had left several voice messages in addition to sending Copeland an email on April 21, 2021, advising that the rental properties had been reinspected after the October 9, 2020, loss, and all undisputed payments had been issued. Finally, the letter stated that it had received no response from Copeland as Plaintiff's representative. Copeland testified that the engineer's report identified Laura and not Delta, but the letter did refer to Delta, thus, causing confusion.

Copeland sent a demand letter to Wilshire/IAT, dated February 2, 2022, requesting an additional $758,429.86 in damages, plus penalties of $1,516,859.72,[21] plus additional penalties of $379,214.93,[22] plus attorney fees of $796,351.35, for a total of $3,450,855.86.[23]

---

[21] For violation of La. R.S. 22:1220 (This statute was renumbered as La. R. S. 22:1973, effective January 1, 2009).
[22] For violation of La. R. S. 22:1892.
[23] Plaintiff's exhibit 8, Doc. 160-8.

Copeland requested these additional payments for alleged damages and testified that he based these damages on information received from Charlie Fisher, of Frontline. Copeland testified that he considered the Delta claim to be a separate claim.

*Diana Steven-Reynolds*

Mrs. Reynolds testified that after Hurricane Laura, she moved into one of the rental properties where she currently lives. Prior to the Hurricane, Reynolds made her living from the rental properties and the motel. Reynolds testified that two of the properties were being occupied by renters when Hurricane Laura occurred, and two of the properties were vacant for over 60 days but were being held for rent.

Reynolds testified that she met a Mr. Huggins who inspected the rental properties. Reynolds said that they took pictures and measurements of the properties, and that she received a $33,000 payment. Reynolds then hired the PA because the $33,000 was not enough for her to repair the four properties.

Reynolds testified that the Mary Street property and the See Street property had trees on them that had to be removed, which cost $7,100 and $6,000, respectively. The insurance company paid to place tarps on the properties. She commented that these tarps were installed prior to Hurricane Delta, but Hurricane Delta tore the tarps off and caused more damage.

Reynolds testified that she repaired the properties with the money received by Wilshire as well as her own money. After the first claim, Reynolds hired Frontline to manage the claim with the insurance company. Mr. Cantrell's law firm paid Frontline for its services, out of the $118,000 supplemental payment by Wilshire.

Reynolds testified that the houses had mold in them and that the only thing she did was cover the houses by reroofing them to keep them from deteriorating further. She thinks that she spent about $18-19,000.00 for the shingle materials. Reynolds also stated that she had receipts that she gave to Wilshire. Reynolds states she has other receipts, but they are scattered, and she paid some in cash, and therefore has no receipts for that part of the work.

Reynolds testified that she is living in the rental property because her home was extensively damaged due to the two Hurricanes and a flood in May of 2020. She also testified that she has other rental properties of which she receives rent. These properties were also damaged as a result of Hurricane Laura. Reynolds has filed suit on the other five properties as well as for her home.

*Eli Reynolds, Jr.*

Mr. Reynolds is married to Mrs. Steven-Reynolds. He testified as to his wife's mental capacity after Hurricane Laura as a result of the damage caused to the rental properties. He also testified that she has sought medical treatment and has been prescribed medication over the past four years.

## EXHIBITS

See CM/ECF Docs. 160 and161 for Plaintiff's and Defendants' exhibits.

## FINDINGS OF FACT AND LAW

Defendant moved for a judgment on partial findings under Federal Rule of Civil Procedure 52(C) as to the first payment. The Court ruled that the first payment was made timely, and thus there is no 22:1892 bad faith claim as to that payment. On November 14, 2020, a second subsequent inspection, and another report was generated. As to the second

payment, a reinspection was made on January 29, 2021, and a payment was made on April 8, 2021, and reissued on May 3, 2021. The Court denied Defendant's motion as to the second payment and took the matter under advisement. As such the Court must determine if the second payments were untimely, and if so, was Wilshire arbitrary, capricious, and without probable cause.

It is not enough to establish that a payment was made untimely. Based on the evidence submitted at trial, the Court finds that Wilshire's second payment was timely. Additionally, Reynolds has presented no evidence to establish that Wilshire's handling of her claim was arbitrary, capricious, and without probable cause in its second set of payments issued on April 8, 2021 and reissued on May 3, 2021.

## CONCLUSION

For the reasons explained herein, the Court finds that Plaintiff, Reynolds has failed to prove by a preponderance of the evidence that Defendant, Wilshire was in bad faith in handling Plaintiff's claims. As such, the Court will enter judgment in favor of Defendant, Wilshire Insurance Company, and against Plaintiff, Diana Steven-Reynolds.

**THUS DONE AND SIGNED** in Chambers on this 19th day of September, 2024.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**